Thank you, Your Honor, and good morning, Your Honors. My name is Ron Chapman. I represent the defendant in this matter, Sheila Harris, and I would like to reserve three minutes for rebuttal. Thank you. Sheila Harris was denied a fair trial and a fair sentencing proceeding for many reasons, but there are four main errors that I wish to discuss today. First, she was denied the ability to confront two crucial witnesses against her who were permitted to testify via video teleconference, and if the issues were with video teleconference weren't any more apparent than today, certainly there is no reason for this court to set a precedent that video teleconference testimony should be taken when there's not a public interest. Second, counsel, I'm going to of course let you talk about two, three, and four, but you started with one as you said crucial evidence. So, point me to the crucial evidence that the two video witnesses testified to with cites to the record and telling me what they said that you consider to be crucial evidence either as to counts 15 and 16 or something else. So, you can go however you want in whatever order. Vega, I mean just Vega, Marlo, however you want to do it, what was the crucial evidence? Absolutely, your honor, and I'm happy to answer that question. However, as this court has ruled in United States versus Carter, the first inquiry before even getting into the substance of the public policy. Okay, so counsel, why don't you assume, doesn't mean I will, but why don't you assume that I'm going to agree with you that that Carter controls this case. There's still, even if you're right, a question of harmless error. You talked about crucial, and I don't, I didn't see anything in the record that indicated that either of these two people gave anything that could ever be described as crucial evidence. I certainly didn't see any of it in the briefs that were filed on behalf of your client, but why don't you tell me what the crucial evidence was? I'm happy to get into that, your honor. First of all, Ms. Vega and Ms. Marlo were the linchpin of the testimony for counts 15 and 16 in that they provided testimony supporting the introduction of their calendars into evidence, which were used to support the governance theory that patients were billed for two days when only one day of service was presented. Okay, but counsel, so I'll go through what I think some of the evidence was, and you can explain to me why you think this is crucial. We had Apana's original notes, the altered notes that had been submitted to TRICARE, Apana's testimony that she created the original notes and not the altered notes, Sviris's and Lesage-Oyamat's testimony that they didn't treat identified in the altered notes and didn't create them, and Fiesta's testimony that at Harris's direction she created the altered notes and submitted them to TRICARE. So if I'm accurately reflecting what the actual testimony is, how could these two witnesses have given crucial testimony and why would their calendars have been crucial testimony given what I just outlined unless I'm wrong? Your honor, their testimony was the only testimony that supported the claim that their children did not receive services on the days that they were billed for services. Both witnesses testified to their explanation of benefit statements. Both witnesses testified to the typical days where they would receive service. I'm sorry, counsel, so maybe I have the facts wrong because what I read, and you tell me if I'm wrong, that Sviris and Lesage-Oyamat, the providers, the putative providers, testified that they did not treat the patients identified in the altered notes and didn't create the altered notes. So isn't that testimony that the services weren't provided by the people who are listed as having provided them? That testimony was given regarding the entire scheme related to 11 patients, your honor, and I believe that that testimony wasn't specific to the Vega child and then the Marlowe child. That's not my understanding, but I might be wrong. I'm sure Ms. Purcell will have a view of that. But go ahead. So you've talked about the calendars. What else is crucial? That testimony was also used to support trial exhibits 901-1, 901-2, and 902. And those exhibits were the critical exhibits that were introduced through the testimony of Special Agent Salazar. And those exhibits assumed that patients Marlowe and Vega were billed for subsequent days where they did not receive service. Those exhibits were introduced through Special Agent Salazar's testimony, were provided to the jury, were discussed in closing argument by the government. Moreover, it's important to note that in this case, there are 90 beneficiaries that were billed for services and included in this scheme. Counsel, what you just said was certainly an answer to my question. Was that pointed out anywhere in your brief? Either of your briefs? I don't recall that it was, your honor, but it is included in the record. Well, and you were answering my question. So go ahead. Thank you. It's important to note here, your honor, that there were 90 total beneficiaries that were in the government's data set that were billed for speech therapy services. Of those 90 beneficiaries, 11 beneficiary witnesses were called by the government to testify. Of those 11 beneficiaries that were called to testify by the government, two of them testified by video teleconference. These 11 witnesses that were called to testify were the most important beneficiary witnesses of the government's data set of 90 witnesses. And they provided evidence that supported not only just the claims for counts 15 and 16, but testimony that supported the entirety of the scheme. And the difficulty here in severing this testimony and determining that this error was harmless, is that the testimony permeated through the entire case. In Shatterwhite versus Texas, Justice O'Connor wrote, some constitutional violations by their nature cast so much doubt on the fairness of the trial process that as a matter of law, they can never be considered harmless violations that pervade, I'm sorry, violations that pervade the entire proceeding fall within this category. In United States versus Coy, the Supreme Court said that in-person confrontation, not by video teleconference, but in person, is a symbol of fairness. It promotes reliability of the proceeding and enhances the accuracy of the fact-finding process. Reading those two cases together, failure to permit in-person cross-examination of these witnesses permeated the entirety of the proceeding. This court's precedent in United States versus Carter prevented a victim of sex trafficking from testifying because she was pregnant and could not testify at that time. It was important in this court's and not have the witness testify at that trial, but another. It was important in this court's determination that the court could have allowed an adjournment of the entire trial, but it was also important in this court's determination that there were other remedies available for the court other than video conference testimony. Now, interestingly in this case, and this is something not cited by the brief, but I actually just saw on the record recently, the judge in this case decided that it was an important public policy interest that military families who are the victims of fraud be able to testify via video teleconference when a third party, their child, has a disability. Interestingly, Julie Marlowe's daughter was in a serious car accident and required immediate care. That accident wasn't discovered until recently before trial, and when Julie Marlowe testified to the judge on the motion hearing on the day of her testimony, she indicated that the reason she could not travel was because she had to take care of her daughter. Interestingly, she was not a military family. She was previously a military family, but her husband at that time was a corporate pilot, and the judge glossed over in this case the fact that Julie Marlowe... Why don't you hold on a second? Judge Bayer, are you back? Looks like we lost you. This has happened time and again. All right. Counsel, why don't you repeat the last 30 seconds or so of your argument on this point for Judge Bayer's benefit, and we'll make sure that we will give you some extra time. Thank you for the opportunity, Your Honor. It's important to note in this case that Julie Marlowe, one of the witnesses who testified via video teleconference, testified that she was unavailable to appear in person at the proceeding because her daughter was in an accident and needed care. The judge in this case determined that the important public policy interest, the trial judge determined the important public policy interest was that military families who are victims of fraud and can't travel should be able to testify via video teleconference. Julie Marlowe was not a military family. At that time, her husband was a corporate pilot, and the only testimony introduced that would suggest that he was unable to take care of his daughter who was in an accident was that he had a busy schedule flying corporate jets. In this case, the court could have easily considered an adjournment, which it rejected because it feared that it could never get everybody's trial schedule together in order to have a hearing in a timely manner. In fact, defendant in this case, trial counsel, requested an adjournment that was rejected. Now, Your Honor, I'd like to get to issues two, three, and four in this case. Sheila Harris was denied the ability to confront the forensic team that created the 900 series of exhibits. The 900 series of exhibits were the most important exhibits that went before the jury. They showed the scheme to defraud. They made the assumption... Was this argument made? It was in response to motions in limine, Your Honor. The government filed a motion in limine to seek introduction of its summary exhibits. The defense responded to that motion in limine seeking to exclude those exhibits, and the court determined at the introduction of those exhibits that those exhibits would be introduced through the testimony of Special Agent Salazar. Is the argument in your brief as to why they should be excluded, was that made to the district court? It was in the motion in limine, Your Honor, but I'd have to check the record. All right, go ahead, counsel. Special Agent Salazar is an FBI agent. She's not a healthcare fraud expert, and she was permitted to testify to various charts that were made that included assumptions created by some people from the Department of Justice and a forensic team. These charts had calculations that were used to create them. These charts had interpretations based on the evidence. These charts were based on interpretations of the trial testimony of some of the witnesses, and these charts were introduced at trial, and they went back to the jury, and the jury used them not only to determine guilt in the guilt phase, but the judge also used them to determine the loss amount, the forfeiture amount, obviously denying an evidentiary hearing on the forfeiture amount and the loss amount. Ms. Harris was denied the ability to confront the creators of the 900 series of exhibits. Moreover, it's important to note that the 900 series of exhibits is an improper extrapolation. Now, in this case, as I indicated before, 11 beneficiary witnesses testified, and the testimony of those 11 witnesses was used to create the assumption that every time there was a claim on two consecutive days, the second claim was false. That was the assumption the government made. Through that assumption, the government extrapolated. So, counsel, isn't it correct that during the trial, but before the admission of the charts, when trial counsel objected, the argument was they were unnecessary because the evidence was not voluminous, but that he conceded that it was accurate, saying, and I quote, I did have a chance to review it, and it appears to be accurate, your honor, as to what's in the charts. So, my objection is not to accuracy, unquote. Your honor, I believe that that statement was made in relation to counsel looking at the claims binder of claims. I don't believe that at that time he was looking at the 900 series of exhibits that were introduced. In fact, there is no way that he would have been able to verify the accuracy of the 900 series of exhibits because they were created by a special DOJ forensics team that did not testify at the trial. He was only talking about the accuracy of the identity of the claims that were submitted, the basis of the summary exhibits. Now, there are 11 beneficiary witnesses who testified. The government used the testimony of those 11 beneficiary witnesses and extrapolated that over the entire data set of 90 patients who were receiving speech therapy treatment from Harris Therapy. As a result of that extrapolation, the government was able to determine a loss amount of over $500,000. Now, in this case, that was improper extrapolation. The government has rejected stating that it used extrapolation methods in this case, but that's simply incorrect. Whenever you are using a certain data set and using it to make assumptions about a larger data set, which is what the government did here, you have the duty to ensure that that is done based on scientific methodology. No scientific methodology was used. The best 11 beneficiary witnesses were called to testify in this case, and they made statements. Those statements were assumptions that were extrapolated over the entire data set. Numerous cases in various circuits have determined that extrapolation needs to be done scientifically, and in fact, even the government Council, I am going to give you extra time, but you may want to get to your other two issues, including the use issue. Thank you very much, Your Honor. We have two simple arguments with respect to the aggravated identity theft and abuse. First, Sheila Harris did not use the identity of the therapist in question. In fact, the identity of the therapist in question was placed on a CMS 1500 form, and CMS's own guidance, the creator of the form, and HMSA's guidance suggest that that entry is an inconsequential entry and is not used for the purposes of processing. The Supreme Court has determined that the term use is fraught with interpretation difficulties, but in this case, it's best to determine that use means to convert to one service. Harris Therapy did not convert the identity of the therapist in question to its own service. Do you agree that the provider ID numbers constitute the statutory required identifying information? I do believe that that is identifying information, yes, Your Honor. So if the provider ID numbers are identifying information, then why wasn't listing them for services that allegedly were never performed by the person whose ID number was used, why isn't that use under the statute? In Nieder v. United States, the court determined that for the predicate offense of identity theft, where the predicate offense is wire fraud, the representation must be material, and our argument here is that in this case, the use of the MPI number was not material. See, Harris Therapy was a credentialed group provider. So counsel, are you conceding that under the statute, the provider ID number was used in the way the statute requires for identity theft, but that we should reverse the convictions on the counts because notwithstanding that it was used, that the provider ID numbers weren't material? Not at all, Your Honor. Harris Therapy did not pretend to be the therapist in this case. Harris Therapy was always the group provider, and that's how it indicated itself on the 1500 form. And in that case, you see on the CMS 1500 form, I believe it was trial exhibit 52, Your Honor, Harris Therapy is listed at the bottom as the group provider. I'm looking at trial exhibit 12. Harris Therapy stated that it was a credentialed group provider, and under HMSA regulations, when you're a credentialed group provider and you submit a CMS 1500 form, that is all the identification that is necessary. That is something that is included and attached to our sentencing statement, and screenshots of the HMSA website was also included. It is not possible. Counsel, since you have exhibit 12 in front of you, what about in box 12 on exhibit 12 where the signature on file is the patient's signature, if I'm understanding it correctly, and the testimony was this wasn't a patient who was treated, why wouldn't the signature on file entry in box 12 constitute the type of inappropriate use that the statute covers? Ms. Harris was not charged with using the identity of patients, but in that case, isn't that in the indictment? Doesn't the indictment say that? I don't believe so, Your Honor, but even then, there are multiple cases that discuss the use of patient's information on a claim that is submitted is not considered use for the purposes of aggravated identity theft. In the name of the specific case I'm referring to escapes me, but it is cited in our brief. In this case, Harris Therapy was always a group provider, and that's how it indicated itself on the CMS 1500. If this court determines that use of this MPI was considered use for the purpose of aggravated identity theft, any mistake involving the identity of somebody on a government document that is submitted and later determined to be fraud would subject that individual to additional two years in jail as a result. That is not how Congress intended the aggravated identity theft statute to work, and that's not just punishment for a mistake on an inconsequential government form. And with that, I'd like to reserve the remaining time for questions, Your Honor. All right, counsel, what was your fourth issue? Because I'm not sure, I think with my questions that I interrupted you before you put them out in summary. I won't charge this against any rebuttal time we give you, but in case I missed it, what was your fourth issue? Thank you, Your Honor. That Ms. Harris was denied an evidentiary hearing to present expert testimony on the loss amount. Your Honor, and that argument is very simple. Rule 32.2 requires that if a party requests the court conduct a hearing, and in our opinion, Your Honor, a hearing cannot be a hearing without the opportunity to present some evidence about the loss amount. Ms. Harris was clearly denied the ability to present expert testimony, which she requested to present in front of the trial court. Instead, the trial court said that it would not hear evidence at that hearing, but hear it at a later hearing. When the day for that later hearing came, the court declined the opportunity to present an expert to discuss proper extrapolation on the loss amount. Thank you, Your Honor. All right, I will give you some time for rebuttal. Okay, counsel for the United States, Ms. Purcell. Thank you, Your Honors. Marian Purcell, Assistant United States Attorney for the United States. There's a lot going on here, and I think the best use of this time would be for me to respond to any questions or concerns that the court may have. Let me give you a moment to ask me where you want, you know, tell me where you want me to start, and if not, I'll just go for it. Well, I will have some questions, so I'll, if with that invitation, so I'm going to start with the aggravated identity theft issue that certainly most of the cases that deal with aggravated identity theft, even with regard to submitting written documents, deal with actually improperly assuming someone's identity or forging their signature on a document. I know that there's a circuit court case from another circuit, Michelle, I believe that, or Michael, that goes further than that, but I mean, the aggravated theft because some parts of the claim are incorrect, the person didn't provide the service, or they're using the person's provider ID number. To me, that isn't exactly within the traditional mold of identity theft, where you're actually impersonating another person, especially where you're actually being prosecuted for the fraudulent submission itself. Why should this type of conduct be doubly punished both for the fraud, which Congress obviously intended to criminalize, but for the aggravated identity theft, where it's not entirely clear to me that this is the type of conduct Congress did intend to criminalize? This conduct fell within the statute because this is a situation in which the defendant quite literally used Karasferis' identity in order to commit the fraud. That was the purpose of using her name. The evidence that she was not the provider of the services referenced in Exhibits 12 and 59, the two claim forms at issue, is extremely strong. Karasferis was on... I don't think there's any question, counsel, that the government presented overwhelming evidence that the provider didn't provide the services, and this wasn't the provider ID, and even that the patient didn't receive the services, but that is why you got a fraud conviction. Why should you also get an identity theft conviction for basically putting phony information on a claim form that doesn't involve a forged signature, or actually trying to assume the identity of another person? I think it precisely does involve assuming the identity of the other person. The only difference is that here, Sheila Harris is not herself claiming to be Karasferis. So there's an actual assumption of an identity going on here with respect to, so we have a rendering provider who's the real person, and then we have the identity of someone else, including that important NPI, which is unique to Ms. Ferris, and it's Sheila Harris, the proof is, that causes that assumption of Karasferis' identity to occur. Do you have Exhibit 12 in front of you, counsel? I will, yes, I do. All right, so my understanding in Box 31, where it says signature of physician or supplier, that the testimony at the trial was the Box 31 signature was, that's on file as Harris's signature, not a provider, correct? That is my understanding, so she's putting this in under her own name, and she's, according to the government and the jury, phoning up the information on the form. In your view, are there any limits to when identity theft can be prosecuted? If you put down here that it was the provider, but it was a phony day, is that enough for identity theft? No, your honor, if it were the actual, if the rendering provider's in Box 33, the billing provider information and phone number, if that had put, had actually included the rendering provider, and if the rendering provider's number had been listed in Box 24J, then the date would be a wire fraud, but it would not be identity theft, if the dates were fine. Okay, so going on your theme of ask questions, I will take you up on that. So with regard to the summary charts, is it your, is it the government's view that we should be looking at this issue for abuse of discretion or plain error, and if you think it's plain error, why is your friend's argument wrong about having preserved the relevant issues? The sole objection made in the trial court to the summary exhibits was that they were not sufficiently voluminous to justify a summary. That was the only objection that was made. It was conceded in the trial court that the underlying data was accurate and that the results were accurate. The defense had possession of all of the underlying data. They were able to sort it the same way that it was sorted by the team, as my opposing counsel likes to refer to it, and they were able to and did confirm that the results were accurate. That wasn't the issue in the trial court. The only issue was we don't need a summary here because it's not a lot of data. Okay, moving to another issue that we asked you to, both counsel, to address. First, do you concede that given the Carter case, the district court erred here? No, your honor. Let me just find my notes. I apologize on that issue. Just a lot of issues floating around here. There are. So in Carter, the primary issue in Carter was that there were viable alternatives available. What happened in Carter was that we had a single and absolutely critical witness who was at the time seven months pregnant and advised by her doctor not to travel for presumably the two months and perhaps a little bit after that. And so a continuance would have solved the problem and it would have solved it relatively easily. And there are two major differences between this case and the Carter case. One is that here we had two witnesses who had, the problems that they were facing had no end in sight. But why wouldn't depositions have worked? A deposition of one of the two was taken by the choice of defense counsel. It was done by, it was itself done by video. And the judge was asked by the government to permit the, the second, I should just explain the facts here a little bit. So the video of, the videotape deposition of Mrs. Vega was, was taken. It was an extremely traumatic event for her because she had to travel with her severely autistic child for an hour or two in the car and had to make a lot of arrangements to make it, took months actually to set that up. And it was a big production. But she succeeded in getting that, that recorded deposition taken. She was present in the room with an agent and the, the attorneys were in a conference room here in Hawaii. The, the other, Mrs., Mrs. Marlowe on the other hand, there was no videotape deposition taken of Mrs. Marlowe because the accident that occurred to her daughter was so close in time to the, to the trial that it would have disrupted a lot of other things. The government asked the court to permit either the use of the existing deposition of Mrs. Vega or videotape testimony. And it was the district court's decision that of those two alternatives, the better one was live two-way video testimony during the course of the trial because it's closer to what would happen if it were physically possible to bring those videos. But notwithstanding that, the defendant object? Yes. Yes. That objection was preserved. And so, so counsel, if we disagreed with you and if we found that Carter was applicable, what's the government's position as to whether the error was harmless or not, if we find that there was error? It was, it was clearly harmless, but let me do one more sentence, if you don't mind, on why this is not the same situation as Carter. So I think it's important to understand both the, the role of the evidence of these two witnesses in the case, but also the two parents testify. Of those 11, six were on the mainland. And at least one of them, the most important, was actually April Yates, who was the original whistleblower in the case. And it was extremely difficult to arrange April Yates' attendance at the trial from the mainland because she too had very serious problems. And we ended up with a four-day window in which she was a continuance of the trial would only cause equally serious problems with other witnesses. So a continuance was not an option as it would have been, as it certainly would have been in Carter. But getting to harmlessness, the, this court has said in Carter, in fact, that we look at the issue of harmlessness based on the importance of the witness's testimony in the whether the testimony was cumulative, and of course, the overall strength of the prosecution's case. These two witnesses, and one of the things that we've kind of been ignoring a little bit, is that these two parents, of course, testified consistently with the overall scheme, and they contributed to the evidence of the scheme as the wire fraud scheme as a whole. But the specific counts that involved Ms. Vega and Ms. Marlow were counts 15 and 16, which are false statements counts. They're not wire fraud counts. And in the false statements counts, the evidence of those particular counts was, in fact, overwhelming without their testimony. We had in count 15, we had the notes that were made by Erica Apana side by side with the phonied up notes. We had Abigail Fiesta's testimony that she made those changes to those notes. That's exhibits 102 and exhibit 105, the before and after. In count 16, we had exhibit 108 and exhibit 111, which also showed Erica Apana's original notes and how they were changed. So the evidence of the misrepresentation of the false statement was overwhelming already. And then we had Erica Apana's testimony. She had a calendar that showed, she had a calendar that showed that she had seen Penelope Marlow on August 10th of 2011, while in fact Ms. Marlow's calendar, she did have a calendar, but it didn't have that particular date. She wrote in it sporadically, and it didn't confirm it. While Erica Apana's calendar did confirm it. We also had the other, I think we have both of them, we had the other provider, Terry Lesage-Oyemah, she testified that Penelope Marlow was not her patient. So we had both sides of that one. And of course Kara Spheres, this is count 15, testified that she was on maternity leave during that period of time. So we had the real therapist for each of them, and the phony therapist for each of them, both testified as to which set of notes was in fact accurate, and the one that was submitted was false. And that's all without the testimony of these two parents. The parents contributed, both of them testified that Erica Apana had been their only, their child's only speech therapist. We knew that also from Erica Apana. They testified that the dates that their child was seen was consistent, and it was once a week. And again, Ms. Marlow had a calendar, but that calendar, by luck, didn't happen to include that particular date. So their evidence was on the substance of those two counts, counts 15 and 16, clearly cumulative. So counsel, I have a question in a different area, and I think this is, in response to your invitation, the last area that I have a substantive question in, and it has to do with the intended loss amount, that the court based the intended loss amount on the claims as written, as submitted, right? Yes, that's correct. And my understanding is that there was evidence that showed that the amount that she could get was limited by the regs, and thus the intended loss amount should have been pegged, the argument goes, to the maximum she could have gotten, even though she listed more, and the maximum she could have gotten was well-defined and presumably well-known to her. Why isn't that a viable argument for the intended loss amount? As I understand it, the guideline provides that there is a presumption that the amount that is requested is the intended loss, and the burden falls on the defendant to rebut that evidence by simply saying, yeah, but the regs wouldn't allow me to get more, or even I had some experience with not receiving as much as I asked for. She needed to put on some form of evidence that... And did she, was there any evidence in the record before, it's Judge Gilmore, right? Yes. Was there any evidence before Judge Gilmore that was presented by the defendant that she somehow knew that all she was going to get was what the regs provided, notwithstanding the claim amount? No, she offered no evidence in sentencing concerning, and there was no evidence built into the trial, concerning her intent or her expectation. Other than the reality, of course, there is evidence of what she was paid. There's that, but that doesn't prove what her intent and expectation was. All right, so I don't know if my colleagues have questions or whatever other areas, Ms. Purcell, you wish to cover. I frankly don't see the purpose in wasting your time if you don't have questions. Thank you. It's certainly not wasting our time, counsel. If you have other areas you want to cover, please do. You're not obligated to. I'm good, thank you very much. All right. Okay, so Mr. Chapman, we will give you three minutes for rebuttal. Thank you, Your Honor. I'd like to discuss the last issue that you discussed, intended loss. United States v. Popoff, a case in this district determined, in this circuit, sorry, determined that where proof of intended loss is lower because reimbursement is lower, that should carry the day in terms of the loss amount. But except, counsel, as your friend stated, that there is a presumption in the guidelines, and I didn't find anything in the record that I could see, whether pointed to in the briefs or not, where your client definitively made this kind of argument, although I did find things in the record from which that could be inferred. Was there anything where your client told Judge Gilmour, no, I only expected to get what was in the regs? No, Your Honor. There was evidence at trial submitted, and when defense requested a hearing on the loss amount, forfeiture amount, and restitution amount, we were denied that ability to present evidence and witnesses, including the testimony of Sheila Harris. However, if we look in the trial record, you can see that Judge Gonzalez clearly testified that there was a contract with HMSA and TriWest, and in that contract, the parties agreed to a very specific reimbursement. In addition to that, HSMA contract was introduced into evidence, so the court is aware that all parties were on the same page, that Harris therapy would be reimbursed a specific amount. That is the best evidence of actual loss and intended loss in this case, the reimbursement amounts that were contractually agreed to. I'd like to go back to the identity theft issue, and I heard my colleague concede that Ms. Harris was not herself pretending to be Karas-Firas, and in this case, without that identity theft, assuming the identity of another, we cannot increase the scope of the identity theft statute to cover all conduct where a number or identifying information related to an individual may be also included in a false claim. Other courts have rejected the idea that patient information, patient ID numbers, are considered ID or use for the purpose of identity theft, and this court should so hold that the use of an inconsequential MPI number is not identity theft. I'd like to discuss the summary charts briefly. It's important to note that the summary charts, the 900 series of exhibits, was already introduced into evidence before Special Agent Salazar testified that a team from the Department of Justice was used to create those charts. So the defense failed to object at the time the specific objections that we're making here. However, it wasn't until later that those and thank you very much for your time, your honors. All right, thank you. We thank both counsel for their helpful arguments, and the case just argued will be submitted.
judges: Wallace, Bea, Bennett